## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FELICIA CARSON, | ) | |
| 10907 St. Patrick's Park Alley | ) | |
| Waldorf, MD 20603, | ) | |
| | ) | |
| LISA BURTON | ) | Civil Action No.: |
| 6012 Burdon Ct. | ) | |
| Alexandria, VA 22315, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| | ) | |
| MURIEL BOWSER, MAYOR | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHIEF OF THE | ) | |
| METOROPOLITAN POLICE | ) | |
| DEPARTMENT | ) | |
| ROBERT CONTEE | ) | |
| | ) | |
| Serve:  DC Attorney General | ) | |
|     Carl Racine, or his designed | ) | |
|     Representative | ) | |
|     441 – 4ᵗʰ Street, N.W. | ) | |
|     Washington, DC 20001 | ) | |
| | ) | |
| *Defendant*. | ) | |

## COMPLAINT FOR DAMAGES AND
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

Comes now Plaintiffs, Felicia Carson (hereinafter "Plaintiff Carson") and Lisa Burton

(hereinafter "Plaintiff Burton"), by and through the undersigned counsel and file this Complaint

for Damages and Declaratory and Injunctive Relief against Defendant District of Columbia Metropolitan Police Department (hereinafter "MPD"), and state as follows:

## **INTRODUCTION**

Plaintiffs,  former Agents within the MPD's Internal Affairs Division (hereinafter "IAD"), were ultimately forced out of IAD by its head, Assistant Chief Wilfredo Manlapaz (hereinafter "Chief Manlapaz"), because of their race and gender, and to prohibit their opposition to race discrimination and professional misconduct in MPD, and within IAD.  IAD is the unit within MPD that investigates allegations of misconduct by police officers, be it of a criminal nature, or merely an alleged violation of an MPD policy or procedure.  Not only do IAD agents conduct the investigations, they also draft the charges, if any, against an officer, and make disciplinary recommendations. In 2018, when Chief Manlapaz was promoted to Internal Affairs Bureau Chief, which also contained a few other departments,  IAD had thirteen Black Agents, nine of whom were Black women, and a Black female in command, Assistant Chief Kimberly Missouri.

Three years later, IAD has only two Black female agents, one of whom transferred into the Department in 2021.  Most of the seasoned and experienced Black women agents were moved out by Chief Manlapaz, either by termination, targeted harassment and retaliation, or due to being overworked and pressured for results which forced them to quit.  Importantly, every Black woman IAD Agent who left the department since 2018 has been replaced by a white Agent.

Plaintiffs Carson and Burton bring this suit alleging that they were victims of a coordinated effort by Chief Manlapaz to remove them and other Black women from the department.  Both were experienced Agents who vocally opposed what they perceived to be IAD management, bias and preferential treatment in favor of white officers.  Both Plaintiffs assert that Chief Manlapaz harbors racist and sexist attitudes made manifest by his own behavior.  Chief Manlapaz has also used his

power to cull Black women from IAD, and to manipulate its investigative process to protect white police officers accused of misconduct.

Plaintiff Carson also asserts that she was wrongfully terminated to silence her and keep her from participating in the disciplinary proceedings of a white male officer she investigated for serious misconduct.   According to her findings, the officer was caught on Body-Worn Camera arresting a young black man under false pretenses, grabbing the young man by the throat, and later repeatedly lying by the entire incident.   During the work-up for the disciplinary review board that would determine the officer's fate, Plaintiff Carson was summarily terminated, thus prohibiting her participation in the proceeding.   Shortly thereafter, senior MPD leadership -- which would necessarily include Chief Manlapaz -- interceded to cancel the trial board and return the officer to his duties.   The intercession was highly irregular for such serious charges of misconduct, and Plaintiff Carson asserts that it was racially motivated.

Plaintiffs seek money damages, reinstatement and back pay. They assert claims pursuant to Title VII of the Civil Rights Act of 1964, federal civil rights claims pursuant to 42 U.S.C. §§ 1981 and 1983, the Family Medical Leave Act, the Age Discrimination in Employment Act, the District of Columbia Human Rights Act, the District of Columbia Whistleblower Protection Act, and, in the alternative, District of Columbia common-law provisions against wrongful termination. Plaintiffs further seek declaratory and injunctive relief ordering the MPD to cease and desist discriminating against Black women IAD Agents, and mandating the MPD Inspector General to conduct a thorough and Court-supervised investigation into potential civil rights violations by MPD Officers, IAD supervisors, and more specifically, Chief Wilfredo Manlapaz.

## PARTIES

1.     Plaintiff Felicia Carson is a Maryland resident and former IAD Agent.  She became a sworn officer with MPD in 1990, and retired in May of 2017.  She worked in IAD as a sworn officer Agent from 2001 until her retirement. Immediately after retiring, she rejoined the MPD as a Senior Police Officer (hereinafter "SPO"), which is a contract retired employee with specialized or needed expertise.  Agent Carson was terminated from her SPO assignment in April of 2019.

2.     Plaintiff Lisa Burton is a Virginia resident, and former IAD Agent.  She is currently still employed in the Technical & Analytical Services Bureau, Firearm Registration Branch, conducting background checks on persons seeking a firearms permit.  Prior to her change in assignment, Agent Burton was the only civilian IAD Agent in the department.  She was a sworn officer with the University of the District of Columbia Police Department, and also worked as a Supervisory Special Agent (Criminal Investigations) with the Department of Homeland Security, before joining MPD in September of 2016.

3.     Defendant District of Columbia is a municipality governed by Mayor Muriel Bowser and the DC City Council.  DC MPD is a law enforcement agency and Department of the DC Government, headed by Chief Robert Contee.

## JURISDICTION AND VENUE

4.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it asserts claims that arise under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981, by way and through 42 U.S.C. § 1983, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 (2006).

5.     This Court also has pendant jurisdiction over Plaintiffs' state law claims pursuant to the District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*, the District of Columbia Whistleblower Protection Act, District of Columbia Code § 1-615-51, *et seq.,* and tort claims against the District of Columbia for negligent supervision and, in the alternative, wrongful termination.

6.     Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402 because substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia.  Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).  This Court is also the proper venue to adjudicate Plaintiffs' pendant state law claims.

## FACTS RELEVANT TO ALL PLAINTIFFS

### MPD'S CENTRALIZED TOP-DOWN POWER HIERARCHY

7.     Much like the military, the MPD has a strict hierarchical decision-making structure and rigid chain of command.  While each level of leader in the hierarchy is granted some authority over day-to-day activities or routine police matters, the ultimate decision-maker on all police matters is the Chief of Police.

8.     The Chief of Police maintains a degree of supervision over the Department's various managers and its Equal Employment Office, and  accessibility to all MPD employees who are able to speak directly to him or her upon request and appointment.

9.     There are seven (7) classes of employees at MPD:

a.     Probationary cadets: persons hired via the police academy who are in their training phase, and are subject to discharge with little recourse other than through the EEOC charge process.

b.      Probationary civilians: persons hired for civilian positions, and who have been employed for less than one year.  They can be terminated without cause within the probationary period with little recourse other than through the EEOC charge process.

c.      Sworn Bargaining Unit officers: officers who are full members of the Fraternal Order of Police, Lodge #1, and benefit from all terms and conditions of employment contained in the Collective Bargaining Agreement (hereinafter "CBA"), including just cause termination and the right to grieve any disciplinary action.

d.      Civilian employees: persons who are governed by the District of Columbia employee manual terms.

e.      Senior Police Officers (hereinafter "SPO's"):  retired officers who have been asked to come back to the MPD as full-time officers, but not as bargaining unit members.  SPO's can receive the assistance of a union representative, but are not subject to just cause termination protections in the CBA.

f.      Management-Level Sworn Officers:  officers with the rank of Lieutenant or Captain or Inspector.

g.      Executives: senior civil service civilians, and sworn officers with the rank of Commander, Assistant Chief (broken into three levels), or Chief.

10.    The MPD is divided into administrative departments, specialized units, and geographically delineated patrol districts. For example, the MPD has an administrative unit responsible for investigating all officer-involved traffic accidents, regardless of district or unit.

11.    It also has operational units, some of which are patrol and community based, others of which are specialized units such as SWAT Team or Harbor Patrol.  The operational functions are

6

broken down into Departments.  The Departments are made up of Bureaus, and the Bureaus are broken down into separate Divisions.

12.    Each Department is overseen by a Bureau Chief.  With respect to policing of the community through patrol district, each district has one Commander, a few Captains (the number of which varies by district), Lieutenants and Sergeants.

13.    MPD Sergeants have the authority to set employee schedules, make daily assignments, determine partnership arrangements, monitor and supervise officer conduct, track officer movements and account for their activities, grant or deny requests for up to eight (8) hours of leave, approve or assign overtime work, verify time sheets, provide content and input to officer performance evaluations, and assign officers vehicles and equipment.

14.    MPD Lieutenants have supervisory authority over Sergeants and serve as the first level of dispute management when officers have concerns or problems with the decisions of their district Sergeants.  Lieutenants ensure that departmental operational goals are met, are responsible for officer evaluations and minor discipline, and have significant input into what officers will be assigned to their department.  Lieutenants have the absolute authority to override the decisions of their subordinate Sergeants.

15.    While minor disciplinary matters can be handled by Sergeants or Lieutenants, the authority to enact major discipline such as suspensions or terminations rests with the Chief of Police and is delegated to the Internal Affairs Bureau, but can be overridden by the Chief of Police at any time.

16.    Regardless of the authority delegated to subordinates, the Chief of Police retains total discretion to override the decisions of his or her subordinates. He or she also enjoys the authority to order any of his or her subordinates to carry out his or her wishes with respect to any employee of the MPD.

17.    The MPD maintains one centralized EEO office for all personnel, whether civilian, SPO, sworn officer or management. This is the office that handles all internal complaints regarding unfair or discriminatory treatment. In theory, it is supposed to investigate, mediate, and address equal opportunity concerns.

18.    All bargaining unit members are subject to the same pay, promotion, assignment and disciplinary procedures as negotiated by the Union and outlined in the Collective Bargaining Agreement.

STRUCTURE AND FUNCTION OF IAD

19.    IAD is a department within the Internal Affairs Bureau, headed by Assistant Chief Manlapaz.

20.    At all times relevant to this Complaint, Chief Manlapaz was also in charge of the EEO Department, Court Liaison and Investigative Unit.  EEO was very recently moved out from under IAD.

21.    Typically, IAD carries approximately 25 Agents.  However, that number was a chronic understaffing of the number of Agents needed to properly handle its workload for several years. IAD currently has twenty-nine (29) Agents.

22.    One of the ways that IAD meets its staffing needs is to offer employment to retired officers, who are willing to come back to MPD as contract Senior Police Officers.  Plaintiff Carson was working in IAD pursuant to the SPO program.

23.    Prior to Chief Manlapaz, the workload of IAD was distributed evenly to ensure that cases did not languish, and that no agent was overburdened.

24.    Upon his arrival in 2018 Chief Manlapaz changed this practice and started to assign cases based on their visibility and the target's vulnerability to serious discipline.  Essentially, Chief

Manlapaz began to steer investigations of officers he favored to agents who were loyal and closely aligned to himself.

25.     Between 2018 and the present, at least four (4) senior agents resigned from IAD because they were being overworked, while several agents in the department were underutilized.

26.     When Chief Manlapaz took over leadership of IAD in 2018, nine (9) of twenty-four (24) IAD agents were Black women.  Four were Black men.

27.     Today, out of twenty-nine (29) Agents there are two Black women and five Black men in IAD.   This represents a reduction in Black female agents from 37% to 7%, over the course of Chief Manlapaz's tenure. Of the current Black female IAD Agents, none are SPOs.

28.     It also represents an almost complete removal of SPOs from IAD.  Because SPO's are all retired employees, they comprise the oldest part of the MPD workforce.

29.     During his tenure, the average age of IAD Agents reduced from early 50's to 30's, again a reduction so severe that it cannot be explained by natural attrition.

AN IAD AGENT'S INVESTIGATIVE DUTIES

30.     The principal duty of IAD agents is to investigate allegations of MPD police misconduct. Agents are given autonomy in the investigative process, and are theoretically allowed to reach their own conclusions about whether the allegation is sustained.  However, supervisory IAD employees do review agent reports and often suggest revisions or amendments.

31.     As a practice, such changes are made by the investigating agent so that when he or she signs the investigation, it accurately reflects the substance of the investigation and the agent's conclusions.

32.     When an IAD manager disagrees with an agent's conclusion, IAD practice is for that manager to append a memorandum to the completed investigation, outlining his or her

disagreement and the basis for it.  It is not acceptable IAD practice for managers to alter investigative reports.

33.     More specifically, it is against policy for IAD management to alter agent investigations once they have been completed and signed.

34.     IAD agent recommendations, however, are not always carried out either by IAD management or by the chain of command of the officer being investigated.  IAD agents often have no idea if their recommendations were executed.

35.     In the case where an officer is referred to a Disciplinary Review Board (hereinafter "DRB") the investigating agent plays a critical role in preparing the case and often testifies at the DRB  in support of the discipline recommended.

36.     A DRB is used when an officer is accused of serious misconduct including, but limited to: excessive use of force, false official statements, all criminal conduct, and conduct of serious moral turpitude.

37.     In almost all DRB proceedings, the investigating agent testifies under oath about the substance of their investigation and is subject to cross examination by the representative of the accused officer, which is often the union or union-provided legal counsel.

38.     In the Spring 2021, Chief Manlapaz announced that he was bringing back what was previously known as the Force Investigation Team (hereinafter "FIT"), a special unit within IAD to investigate officer-involved shootings.  No Black female agents were assigned to the FIT.

## THE ROLE OF THE EEO DEPARTMENT

39.     The Director of the MPD EEO Office, Alphonso Lee (hereinafter "Mr. Lee"), has held his position since 2017.  Until very recently, Mr. Lee reported directly to Chief Manlapaz.

40.     Between December of 2020 and June of 2021, the EEO Office was managed by Mr. Lee, and three (3) subordinate EEO Counselors: Doreen Haines (hereinafter "Ms. Haines"); Rosemarie Lucero (hereinafter "Ms. Lucero"); and Renae Lee (hereinafter "Ms. Lee").   All three of these EEO Counselors made internal complaints against Mr. Lee.

41.     Between February and December of 2020, Harry Carter (hereinafter "Mr. Carter") was an EEO Counselor.

42.     The sworn affidavits of Ms. Rosemarie Lucero, Harry Carter and Renae Lee are attached hereto as EXHIBITS 1, 2 and 3, respectively.[1]  They explain in detail how the MPD EEO Office functioned.

43.     During his tenure as MPD's EEO Director, Mr. Lee has maintained a system that intentionally discredits Black women complainants, effectuates a pattern and practice of retaliation, and bullies his subordinates into disavowing any and all claims of discrimination filed by Black women officers, thereby resulting in the Defendant's sanctioning of discriminatory practices against them.

44.     As attested by Ms. Lucero in her sworn affidavit included as EXHIBIT 1, Mr. Lee holds and expresses denigrating views about female police officers in general, and Black female police officers in particular.

45.     Mr. Lee has repeatedly expressed to his staff his belief that all female complainants are "liars" and "lazy," and that they all make EEO complaints to be manipulative.  *See* EXHIBIT 1 & 2.

46.     Mr. Lee has made his views, which demonstrate sexist and racist behaviors, known to his subordinates so frequently that they refer to it as his "mantra."  *See* EXHIBITS 1 & 2.

---

[1] EXHIBITS 1, 2 and 3 were submitted in support of the Complaint filed in *Brinkley v. District of Columbia*, 1:21-CV-01537 (RBW).

47.     Upon information and belief, in the course of four years, Mr. Lee has not permitted *a single claim* of race or gender discrimination filed in his office to be substantiated.  *See* EXHIBITS 1, 2 & 3.

48.     As can be seen in Mr. Carter, Ms. Lee's and Ms. Lucero's affidavits, Mr. Lee believes, and has repeatedly stated that MPD is not subject to federal equal employment and non-discrimination laws.  *See* EXHIBITS 1, 2 & 3.

49.     Mr. Lee demands that his subordinates report to him what EEO complainants have said in initial interviews, and then goes to management himself, to coordinate what the management response will be ***prior to*** the commencement of any investigation. *See* EXHIBITS 1, 2 & 3.

50.     Mr. Lee requires that EEO Counselors record all initial interviews, and then provides and/or plays these recordings for Chief Manlapaz.  *See* EXHIBITS 1 & 2.

51.     According to Mr. Carter and Ms. Lucero, this practice of playing recordings for management contributed directly to immediate retaliation against complainants, and the pervasive perception that EEO interviews and complaints were not confidential.  *See* EXHIBITS 1 & 2.

52.     Mr. Lee demands that his subordinates investigate, not with an impartial eye to ascertain the truth, but with an agenda to find facts that will undermine complainants' claims as well as their credibility.  *See* EXHIBITS 1, 2 & 3.  In doing so, he directs his subordinates to place statements in investigative reports to paint complainants in a negative light.  *See* EXHIBITS 1 & 2.

53.     Mr. Lee edits and manipulates written reports, exit letters and other documents that are supposed to reflect the issues raised by a complainant, to ensure that the DC Office of Human Rights (hereinafter "OHR"), or the EEOC is misled about what it should be investigating.  *See* EXHIBITS 1 & 2.

54.     Mr. Lee works with MPD management to coordinate management responses to undermine complainants, and to assist in bullying them and/or forcing them out.  *See* EXHIBITS 1, 2 & 3.

55.     The Mayor's Office, District of Columbia City Council, OHR, IAD, Office of the Inspector General (hereinafter "DC IG"), and the DC Attorney General's Office have received multiple complaints and allegations against Mr. Lee and the MPD EEO Office but have either refused to acknowledge them, or to engage in any meaningful action to remedy the entrenched aforementioned polices, practices and/or customs.

56.     Because of the dysfunctional and retaliatory nature of the MPD EEO Office, Black women members are left with little recourse but to seek assistance from external entities, DC OHR, the EEOC, and the DC IG office.  But, as soon as they do so, they become victims of systemic and coordinated retaliatory efforts to bully, harass and force them out of their employment.

57.     MPD executive management, including Chief Manlapaz, has received numerous complains about Mr. Lee and has refused to take any action to mitigate his obvious, and systemic pattern of EEO abuses.

58.     Both Plaintiffs raised internal complaints and concerns about the way they were being treated by Chief Manlapaz with EEO.

59.     Because Mr. Lee reported to Chief Manlapaz at the time, it was inappropriate for him to supervise or have any role in the investigations of the allegations against Chief Manlapaz.

<u>FACTS RELEVANT TO PLAINTIFF FELICIA CARSON</u>

60.     Plaintiff Carson began her employment as an SPO in IAD in 2017.  Prior to that date, she was employed as an IAD Agent since 2001, and had retired. She is 54 years of age.

61.     Plaintiff Carson is a single parent of three children.  Her youngest daughter is now thirteen, and was ten years old when Plaintiff Carson returned to MPD as an SPO IAD Agent.

62. Plaintiff's daughter, Logan, was diagnosed with Leukemia in 2010 and has additional special needs. Plaintiff used intermittent leave from that point to care for Logan and to take her to doctor's appointments.

63. When Plaintiff returned to IAD as an SPO, the department leadership was well aware of Plaintiff Carson's situation and that she was a single parent of a special needs child. Plaintiff thus asked for and was approved to use intermitted FMLA leave.

64. In January 2019, Plaintiff Carson was assigned an investigation into a white male officer, James Craig (hereinafter "Officer Craig"). Officer Craig had been accused of wrongfully grabbing a young black male by the throat and subsequently lying about the basis for an arrest to his superiors. The incident took place on or about April 9, 2018.

65. When Plaintiff Carson received the case, she also received the incident's Body-Worn Camera (hereinafter "BWC") footage. The BWC showed that Officer Craig grabbed a citizen, Marquise Jackson (hereinafter "Mr. Jackson"), by the neck while arresting him. He then charged Mr. Jackson with resisting arrest.

66. The footage showed that Mr. Jackson did not move from the place he was standing, that his hands remained in his pockets, that he never raised a hand or his voice to the officer and was compliant when he was taken into custody.

67. Plaintiff Carson concluded that Officer Craig violated general orders by grabbing Mr. Jackson by the throat, which is not taught in the academy, that Officer Craig lied about what had occurred, fabricated a basis to charge Mr. Jackson and falsely imprisoned him. Officer Carson concluded that Marquise Jackson was assaulted and arrested without probable cause.

68.     The U.S. Attorney who received the charge of resisting arrest against Marquise Jackson dismissed the case *the next day* on the grounds that there was insufficient evidence that Mr. Jackson had committed any crime.

69.     Plaintiff Carson was not the first investigator on the case. She took over the investigation from Agent Tracy Malcolm, who abruptly resigned (hereinafter "Agent Malcolm").  Having seen the BWC footage, Agent Malcom equally concluded that Officer Craig had engaged in serious misconduct and made false statements.  Accordingly, she referred Officer Craig's case to the US Attorney for criminal prosecution.

70.     In November of 2018, the US Attorney notified MPD that it opted not to criminally prosecute Officer Craig for false imprisonment and assault, despite the evidence from the BWC and the witness statements.

71.     Plaintiff Carson nevertheless continued her investigation, and filed her first report on or about February 19, 2019, in which she substantiated that Officer Craig had made false statements, and engaged in prejudicial conduct for grabbing Mr. Jackson by the throat.  *See* EXHIBIT 4.

72.     On or about February 25, 2019, Officer Carson amended the report to include the misconduct of the supervisor who signed off on Officer Craig's arrest report for violation of general orders.

73.     On or about February 26, 2019, Officer Carson's supervisor, Captain Brian Bray (hereinafter "Cpt. Bray") returned the investigation to her, and told her that Chief Manlapaz had changed the findings.  Cpt. Bray actually apologized to Officer Carson for having to re-sign the investigation, and told her that Chief Manlapaz "did not want to hurt" Officer Craig.  At that time, Plaintiff Carson did not understand Capt. Bray's comment.

74.     She opted to sign the altered report because she did not think the changes were material, and believed she could explain herself and her conclusions at the Disciplinary Review Board, rather than confront Chief Manlapaz about the deviation from policy in altering the report, rather than appending a memo.  *See* EXHIBIT 5.

75.     While it is not uncommon for certain kinds of substantiated charges to be referred to the DRB Director to negotiate a lesser discipline with the accused Officer, such diversion does not occur with serious charges such as a substantiated charge of making false statements.

76.     On information and belief, in the last ten years, no MPD Officer who faced substantiated charges of making false statements was able to divert away from the DRB to negotiate lesser discipline; Officer Carson had no reason to believe that such would occur with Officer Craig.

77.     A DRB was scheduled for Officer Craig in May of 2019, and she was preparing to testify before it.  Plaintiff Carson was, however, terminated from her employment on or about April 30, 2019.

78.     Shortly after her termination, the DRB for Officer Craig was cancelled and he was allowed to negotiate a lesser discipline.  On information and belief, the only persons in MPD with the authority to cancel a DRB and refer a case to negotiation are Assistant Chief Manlapaz and the Chief of Police.

79.     During her tenure as an SPO in IAD, Plaintiff Carson had a very strained relationship with her immediate supervisor, Lt. Conboy.

80.     Prior to being an SPO, Plaintiff Carson worked under Lt. Conboy as a sworn IAD officer, and received two performance reviews from him rated as outstanding (five out of five).

81.     During the time that Plaintiff worked under Lt. Conboy, she took intermittent FMLA leave to care for her daughter without issue.

82.     However, when Plaintiff Carson returned as an SPO to IAD, Lt. Conboy's attitude towards her completely changed, and he began take negative and retaliatory action against Plaintiff Carson.

83.     Further, when Plaintiff Carson returned from taking FMLA leave, Lt. Conboy consistently assigned her to weekend duty, which was deemed a negative assignment usually spread out across the squad.  He targeted Plaintiff Carson for this undesirable assignment, but did not do the same for the two white male officers in the squad who also took FMLA leave.

84.     On or about November 13, 2018, Lt. Conboy dropped Plaintiff Carson's performance evaluation from a five-rating to a three-rating, which was an acceptable rating, but was below her typical performance.

85.     Plaintiff Carson appealed the evaluation because she felt it was unfair and inaccurate. In his response to the appeal, Lt. Conboy admitted that Plaintiff's absences from work played a significant role in his evaluation of her performance.

86.     In actuality, Plaintiff Carson had taken more time off to care for Logan in the years when she received a five rating from Lt. Conboy, than during the period in which he gave her a three rating.  Thus, his claim that Plaintiff was excessively absent was inherently specious.

87.     During the appeal hearing, Plaintiff Carson was told that she carried the burden of proof to establish that her rating was inaccurate, which is a deviation from past practice.  Plaintiff Carson was not in possession of the evidence to contradict Lt. Conboy's assertion, and the request from the performance review board caught Plaintiff Carson by surprise.

88.     Because he claimed IAD's work product was "confidential" the performance review board did not require Lt. Conboy to produce any evidence to substantiate his rating.  Basically, Plaintiff Carson was given no mechanism to prove that Lt. Conboy's inaccurate assessment was unfounded.

89.     Also, in a serious deviation from standards, the performance review board for Plaintiff Carson was staffed with one of her IAD colleagues, rather than a neutral person from a different department.

90.     In March 2019, Capt. Bray informed Plaintiff Carson that her SPO contract was not going to be renewed.  This decision came out of the blue and made no sense because the department was seriously understaffed.  Even though Plaintiff Carson received a three on her evaluation, that rating was considered a "valued employee," and was not a basis for termination.

91.     Capt. Bray admitted that he was surprised by Chief Manlapaz's decision to terminate Plaintiff's Carson contract, and stated to Plaintiff Carson that he had recommended her retention.

92.     In March,  2019, Plaintiff Carson filed an internal EEO complaint against Lt. Conboy and Chief Manlapaz alleging that they had discriminated against her based on her race, gender and age, and retaliated against her for using FMLA leave.  She also asserted that she was being retaliated against for complaining about Lt. Conboy.

93.     On or about April 12, 2019, Plaintiff's employment with MPD was terminated without justification or explanation.

<u>PLAINTIFF CARSON'S CLAIMS</u>

(Race Discrimination)

**COUNT I**
**Violation of Title VII**

94.     Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

95.     Over the course of her nineteen (19) year tenure in IAD, Plaintiff Carson has observed and asserts herein that Black officers at MPD are subjected to more frequent and harsher  discipline for the same offenses than their white counterparts.

96.    Upon information and belief, that Black officers are subject to harsher discipline to a statistically significant degree, and that robust discovery on this issue will prove it.

97.    This disparity substantially increased during the tenure of Chief Manlapaz, who was far more active in inserting himself into Agent investigations than his predecessor.

98.    Chief Manlapaz used his power and office to protect and help white police officers he favored, who were investigated for misconduct by inserting himself into their disciplinary process to mitigate or bypass discipline for them.

99.    In addition to his favoritism towards white officers,  Chief Manlapaz harbors racial animus against Black women, and actively and systematically removed Black women IAD Agents from the department.

100.    Plaintiff Carson was given a false and inaccurate performance evaluation by Lt. Conboy because of her race and in furtherance of Chief Manlapaz's scheme to remove Black women Agents from IAD.

101.    Lt. Conboy's assessment of her work product was false, in total contrast with his assessment of her work in previous years, without basis in fact, and intentionally designed to place her employment in jeopardy.

102.    Lt. Conboy's reaction to Plaintiff Carson's absences from work was disparate and harsher than his reaction to absences from work of white male Agents.

103.    Lt. Conboy singled her out for undesirable weekend assignments, and other unpleasant and/or onerous tasks because of her race.

104.    Despite receiving an unfair performance evaluation, a three rating was still considered a "valued employee" with acceptable performance, and does not arise to a basis for termination.

105.    There was no legitimate business reason to terminate Plaintiff Carson's employment, given that IAD was understaffed at the time, and several Agents were so overworked they voluntarily quit the department.

106.    Plaintiff Carson's vast amount of experience in IAD and long tenure with MPD makes her abrupt termination illogical, and likely the result of unlawful racial animus.

107.    Plaintiff Carson asserts that Chief Manlapaz terminated her employment because she was an experienced and confident Black woman Agent who encouraged objective and impartial, race neutral investigations and opposed favoritism towards white officers at MPD.

108.    Plaintiff Carson asserts that her termination was an unvarnished act of race discrimination in violation of Title VII; as a direct and proximate cause of her termination she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

109.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $350,000.00. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

## COUNT II
## Violation of the DCHRA

110.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

111.    Plaintiff Carson reasserts all legal and factual predicates for her race discrimination claim under Title VII as if fully restated herein.

112.    Plaintiff Carson asserts that her termination was an unvarnished act of race discrimination in violation of the DCHRA, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

113.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $250,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

## COUNT III
### Violation of 42 U.S.C. Section 1981, Enforced by Section 1983

114.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

115.    Plaintiff Carson reasserts all legal and factual predicates for her race discrimination claim under Title VII as if fully restated herein.

116.    Chief Manlapaz's open hostility to Black Agents encumbered her ability to make and enforce an employment contract, and that his termination of her employment due to her race breached the terms of that contract.

117.    Plaintiff's termination was an unvarnished act of race discrimination in violation of 42 U.S.C. § 1981, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

118.    Plaintiff Carson seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983.

119.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000.00. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

(Gender Discrimination)

## COUNT IV

**Violation of Title VII**

120.     Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

121.     Plaintiff Carson asserts that Chief Manlapaz harbors a peculiar and particular animus towards Black women at MPD, and that he made his dislike of Black women known as soon as he took over IAD.

122.     On information and belief, at least eight (8) different Black women MPD agents have filed internal and/or external complaints against Chief Manlapaz since 2017.

123.     Plaintiff Carson asserts that EEO Director Alphonso Lee also shares this animus towards Black women at MPD, and that Chief Manlapaz and Mr. Lee work together to attack, harm, discredit and remove Black women from MPD.

124.     Plaintiff Carson asserts that in addition to his favoritism towards white officers, Chief Manlapaz harbors gender animus against Black women, above and beyond, and of a different nature to his animus against Black men, and that Chief Manlapaz acted on his animus by actively and systematically removing Black women IAD Agents from the department, while keeping the level of Black men in IAD constant.

125.     Plaintiff Carson asserts that she was given a false and inaccurate performance evaluation by Lt. Conboy because of her gender, and in furtherance of Chief Manlapaz's scheme to remove Black women Agents from IAD.

126.     Plaintiff Carson asserts that Lt. Conboy's assessment of her work product was false, in total contrast with his assessment of her work in previous years, without basis in fact, and intentionally designed to place her employment in jeopardy.

127.   Plaintiff Carson asserts that Lt. Conboy's reaction to her absences from work was disparate and harsher than his reaction to absences from work of male Agents.

128.   Plaintiff Carson asserts that Lt. Conboy singled her out for undesirable weekend assignments, and other unpleasant and/or onerous tasks because of her gender.

129.   Plaintiff Carson asserts that despite receiving an unfair performance evaluation, a three rating was still considered normal and acceptable performance, and does not arise to a basis for termination.

130.   Plaintiff Carson asserts that there was no legitimate business reason to terminate her employment, given that IAD was understaffed at the time, and several Agents were so overworked they voluntarily quit the department.

131.   Plaintiff Carson asserts that her vast amount of experience in IAD, and long tenure with MPD makes her abrupt termination illogical, and likely the result of unlawful gender animus.

132.   Plaintiff Carson asserts that Chief Manlapaz terminated her employment because she was an experienced and confident Black woman Agent who opposed favoritism towards white male officers at MPD.

133.   Plaintiff Carson asserts that her termination was an unvarnished act of gender discrimination in violation of Title VII, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

134.   Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $350,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

## COUNT V
## Violation of the DCHRA

135.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

136.    Plaintiff Carson reasserts all legal and factual predicates for her gender discrimination claim under Title VII as if fully restated herein.

137.    Plaintiff Carson asserts that her termination was an unvarnished act of gender discrimination in violation of the DCHRA. As a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

138.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000.00. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

(Age Discrimination)

## COUNT VI
## Violation of the ADEA

139.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

140.    Plaintiff Carson is a Black female over the age of forty (40).

141.    Plaintiff Carson asserts that Chief Manlapaz harbors a peculiar and particular animus towards older workers, and that he has made his dislike of older workers in general, and SPO's in particular, known as soon as he took over IAD.

142.    On information and belief, the average age of Agents in IAD has dropped by more than fifteen years from 2018, when Chief Manlapaz took over, to now.  Chief Manlapaz has also reduced the number of SPOs in IAD from 6 to 0.  Two white male SPOs have recently been added to the IAD roster.

143.    Plaintiff Carson asserts that EEO Director Lee also harbors animus towards older workers at MPD, and that Chief Manlapaz and Mr. Lee work together to attack, harm, discredit and remove older workers and SPO's from MPD.

144.    Plaintiff Carson asserts that she was given a false and inaccurate performance evaluation by Lt. Conboy because of her age, and in furtherance of Chief Manlapaz's scheme to remove older Agents from IAD.

145.    Plaintiff Carson asserts that Lt. Conboy's assessment of her work product was false, in total contrast with his assessment of her work in previous years, without basis in fact, and intentionally designed to place her employment in jeopardy.

146.    Plaintiff Carson asserts that Lt. Conboy singled her out for undesirable weekend assignments, and other unpleasant and/or onerous tasks because of her age.

147.    Plaintiff Carson asserts that despite receiving an unfair performance evaluation, a three rating was still considered normal and acceptable performance, and does not arise to a basis for termination.

148.    Plaintiff Carson asserts that there was no legitimate business reason to terminate her employment, given that IAD was understaffed at the time, and several Agents were so overworked they voluntarily quit the department.

149.    Plaintiff Carson asserts that her vast experience in IAD, and long tenure with MPD makes her abrupt termination illogical, and likely the result of unlawful age discrimination.

150.     Plaintiff Carson asserts that Chief Manlapaz terminated her employment because she was an experienced and confident Agent who would challenge and oppose his actions.

151.     Plaintiff Carson asserts that her termination was an unvarnished act of age discrimination in violation of the ADEA, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

152.     Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

## COUNT VII
## Violation of the DCHRA

153.     Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

154.     Plaintiff Carson reasserts all legal and factual predicates for her age discrimination claim under the ADEA as if fully restated herein.

155.     Plaintiff Carson asserts that her termination was an unvarnished act of age discrimination in violation of the DCHRA, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

156.     Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

(FAMILY LEAVE RETALIATION CLAIM)

## COUNT VIII
## Violation of FMLA

157.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

158.    Plaintiff Carson applied for and was approved to use intermitted FMLA leave to care for her special needs child.

159.    Plaintiff Carson's need to care for her child was well known to her supervisors, inasmuch as she used FMLA leave to care for her daughter Logan in each of the five years prior to the year she was terminated.

160.    Plaintiff Carson used less FMLA leave in 2018 and 2019 than she had used in years prior because Logan's health improved during that time.

161.    Plaintiff Carson's supervisor, Lt. Conboy, retaliated against Plaintiff for using and taking FMLA leave by assigning her undesirable duties, such as weekend duty, when she used FMLA.

162.    When confronted about why he was always assigning Plaintiff Carson undesirable tasks and weekend duty, Lt. Conboy admitted it was because she had been absent.

163.    When Plaintiff Carson appealed her inaccurate performance review, one of the reasons Lt. Conboy gave for giving Plaintiff Carson a performance rating substantially lower than he had given her in the past was because of her absences.

164.    All of Plaintiff Carson's absences were covered by FMLA.

165.    Plaintiff asserts that Lt. Conboy retaliated against her because she used FMLA to take care of her daughter, and that his negative treatment of her contributed to the basis for her termination.

166.    Plaintiff asserts that Chief Manlapaz decision to terminate her employment was motivated in part by a desire to retaliate against her for using FMLA leave.

167.    Plaintiff Carson asserts that her termination was an unvarnished act of retaliation in violation of the FMLA, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

168.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole

(WHISTLEBLOWER CLAIM)

### COUNT IX
### Violation of DCWPA

169.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

170.    As an IAD Agent, Plaintiff Carson investigated allegations of misconduct and criminal behavior by police officers.

171.    In doing her job, Plaintiff Carson regularly informed her supervisors of activity covered by the DC Whistleblower Protection Act (hereinafter "DCWPA").

172.    In 2019, Plaintiff Carson investigated an allegation of criminal conduct against Officer Craig, who was favored and protected by Chief Manlapaz.

173.    On information and belief, Chief Manlapaz altered Plaintiff Carson's report on Officer Craig, rather than appending a memo to it, which is contrary to MPD policy.

174.    On or about April 12, 2019, Chief Manlapaz terminated Plaintiff Carson, a seasoned and veteran IAD Agent, during a time of labor shortage in IAD, without reason or justification.

175.    Shortly after Plaintiff Carson was terminated, the disciplinary proceeding scheduled against Officer Craig was cancelled, and he was given the opportunity to negotiate a lesser consequence.

176.    Plaintiff Carson asserts that the substantiated charge of making false statements against Officer Craig, was the type of charge that was never deferred to lesser punishment, and was always heard by a Disciplinary Review Board.  Plaintiff Carson relies on her nineteen (19) years of experience in IAD to make this assertion.

177.    Plaintiff Carson asserts that Chief Manlapaz inserted himself into the disciplinary process to protect Officer Craig, and that the Chief of Police approved of Chief Manlapaz's actions.

178.    Plaintiff claims and asserts that she was terminated because Chief Manlapaz knew she would have opposed diverting Officer Craig from a Disciplinary Review Board, and that her termination was motivated in part in keeping her from participating in, and testifying before a DRB.

179.    Plaintiff asserts that her termination was a violation of the DCWPA, designed to silence her and prohibit her from participating in an official proceeding to hold an officer accountable for alleged serious misconduct.

180.    Plaintiff Carson asserts that her termination was an unvarnished violation of the DCWPA, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

181.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

(WRONGFUL TERMINATION)

## COUNT X
## Wrongful Termination in Violation of Public Policy
*(Plead in the Alternative)*

182.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

183.    As an IAD Agent, Plaintiff Carson's job was to investigate allegations of misconduct and criminal behavior by police officers.

184.    In doing her job, Plaintiff Carson regularly informed her supervisors of criminal conduct and misconduct by police.

185.    In 2019, Plaintiff Carson investigated an allegation of criminal conduct against Officer Craig, who was favored by Chief Manlapaz, and whom Cpt. Bray stated Chief Manlapaz "did not want to hurt."

186.    On information and belief, Chief Manlapaz altered Plaintiff Carson's report on Officer Craig, rather than appending a memo to it, which is contrary to MPD policy.

187.    On or about April 12, 2019, Chief Manlapaz terminated Plaintiff Carson, a seasoned and veteran IAD Agent, during a time of labor shortage in IAD, without reason or justification.

188.    Shortly after Plaintiff Carson was terminated, the disciplinary proceeding scheduled against Officer Craig was cancelled, and he was given the opportunity to negotiate a lesser consequence.

189.    Plaintiff Carson asserts that the substantiated charge of making false statements against Officer Craig was the type of charge that was never deferred to lesser punishment, and was always heard by a Disciplinary Review Board.  Plaintiff Carson relies on her nineteen (18) years of experience in IAD to make this assertion.

190.    Plaintiff asserts that Chief Manlapaz inserted himself into the disciplinary process to protect Officer Craig, and that the Chief of Police approved of Chief Manlapaz's actions.

191.    Plaintiff claims and asserts that she was terminated because Chief Manlapaz knew she would have opposed diverting Officer Craig from a Disciplinary Review Board, and that her termination was motivated in part in keeping her from participating in, and testifying before a DRB.

192.    Plaintiff asserts that her termination was contrary to public policy, designed to silence her and prohibit her from participating in an official proceeding to hold an officer accountable for alleged serious misconduct.

193.    Plaintiff Carson asserts that her termination was in violation of public policy, and as a direct and proximate cause of her termination, she has suffered lost wages, lost benefits, damage to her reputation, mental anguish and emotional stress.

194.    Plaintiff Carson asks this Court to award her compensatory and equitable damages, front pay, back pay, interest, cost and fees, and attorney's fees of not less than $500,000. She also asks this Court for declaratory judgment reinstating her to her job as an SPO in IAD, and all other remedies the Court deems appropriate to make her whole.

### (COMMON LAW CLAIMS)

### COUNT XI
### Breach of Covenant of Good Faith and Fair Dealing

195.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

196.    Plaintiff Carson asserts that a valid contract existed between herself and the MPD.

197.    Like all contracts, that contract contained an implied covenant of good faith and fair dealing, that bound both parties to acting in the spirit and intent of the contract, and that prohibits actions from either side that would frustrate the purpose of the contract.

198.    The purpose of the SPO contract was to provide MPD with seasoned officers with experience and/or specialized skills to shore-up manning needs at MPD.

199.    The IAD was short staffed when Plaintiff Carson was employed there as an SPO.  By fulfilling her duties, she was complying with and living up to her responsibilities under the contract.

200.    MPD's obligations under the contract were to provide Plaintiff Carson with employment, and to hold her to the same standards and expectations as her fellow officers.

201.    MPD was also obligated to adhere to the laws of the District of Columbia in the way that it treated Plaintiff Carson, and was not free to discriminate against her, or retaliate against her, in violation of local or federal law.

202.    Nor was MPD free to terminate Plaintiff Carson's contract for a reason that is contrary to public policy.

203.    In the instant case, Plaintiff asserts that she was terminated, at least in part, in order to silence her and to keep her from participating in a disciplinary proceeding for an officer she investigated for serious misconduct.

204.    Plaintiff Carson was prepared to testify about the fact that the subject of her investigation likely violated the civil rights of a District of Columbia citizen, and lied about it in official statements.

205.    Plaintiff Carson asserts that MPD senior leadership, including Chief Manlapaz, so favored this officer, that it interceded to avoid the Disciplinary Review Board process, and allow him to remain employed at MPD.

206.    Plaintiff Carson asserts that in her nineteen (19) years in IAD, she has never seen such serious substantiated charges diverted to negotiations, and that MPD senior management never interceded in such a manner to protect a non-white officer.

207.    Plaintiff Carson asserts that terminating her employment to silence her violates the covenant of good faith and fair dealing, and undermines the spirit and purpose of the contract between the parties.

208.    As a direct and proximate cause of Defendant's breach of the covenant of good faith and fair dealing in the SPO contract, Plaintiff Carson suffered lost wages and benefits, and damage to her reputation.  She now seeks compensatory damages as deemed appropriate by this Court, as well as an order reinstating her to her employment, and any and all other remedies deemed appropriate by this Court to make her whole.

## COUNT XII
### Negligent Supervision

209.    Plaintiff Carson references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

210.    On information and belief, no less than eight (8) complaints against Chief Manlapaz have been filed by Black women police officers since 2017.

211.    Black women officers have complained about Chief Manlapaz for being both racist and sexist, and for favoritism to white male officers both internally, and to the DC Office of Human Rights, the EEOC, the Mayor's Office and the DC City Council.

212.    Specific and detailed allegations against Chief Manlapaz have been filed by officers from every department at a volume that placed Defendant on clear notice that there was a problem with him.

213.    On information and belief, several complaints against Chief Manlapaz have been filed with the District of Columbia Office of the Inspector General.  To date, the OIG has taken no action on any of these complaints.

214.    On information and belief, several members of the MPD chain of command have raised concerns about Chief Manlapaz inserting himself into IAD investigations to protect and shield white officers from scrutiny and discipline.  None of these concerns have been taken seriously or addressed.

215.    The Chief of Police and Mayor Bowser owe a duty of care to all MPD officers and employees to ensure that they can maintain their employment free from discrimination or retaliation contrary to public policy.

216.    The Chief of Police and Mayor Bowser owed a particular duty of care to Agents within IAD to protect them from retaliation for doing the difficult job of policing the police and maintaining the public trust.

217.    The Chief of Police and Mayor Bowser violated their duty to Plaintiff Carson by willfully ignoring the voluminous and diverse complaints against Chief Manlapaz, and allowing him to remain in his position.

218.    The Chief of Police and Mayor Bowser violated their duty to Plaintiff Carson by refusing to take seriously her allegations against Chief Manlapaz pertinent to his protection of an officer credibly accused of serious misconduct.

219.    Plaintiff Carson was directly harmed by Chief Manlapaz's termination of her employment in violation of both federal and DC law and directly harmed by the negligence of the Chief of Police and Mayor Bowser in its failure to more carefully and properly supervise Chief Manlapaz.

220.    Because the Chief of Police and Mayor Bowser were placed on notice of the risk that Chief Manlapaz posed to the MPD and to the officers under his control, they could reasonably foresee the harm Chief Manlapaz caused to Plaintiff.

221.    The harm that Plaintiff Carson suffered was predictable, and closely related to the other claims made against Chief Manlapaz in the past.

222.    As a direct and proximate cause of the negligence of the Chief of Police and Mayor Bower in supervising Chief Manlapaz, Plaintiff suffered lost wages and benefits, damage to her reputation, and severe mental and emotional stress.  She now seeks compensation in an amount deemed appropriate by the Court, as well as reinstatement to her previous position, and all other remedies the Court deems appropriate to make her whole.


### FACTS RELEVANT TO PLAINTIFF BURTON'S CLAIMS

223.    Plaintiff Burton joined MPD in 2016 as a criminal research specialist.   She competed and was promoted into IAD as the first-ever civilian professional Agent in MPD history.

224.    Plaintiff Burton is a Black female over the age of forty (40).

225.    At the time she joined MPD, the head of the Department was Assistant Chief Kimberly Missouri (hereinafter "Chief Missouri"), a Black female.

226.    In 2018, Chief Missouri retired and was replaced by Chief Manlapaz.  Plaintiff Burton noticed officers making inappropriate racist and sexist comments once Chief Manlapaz took over.

227.    Plaintiff Burton observed that Chief Manlapaz did not treat the Agents in the department equitably, but rather, he had a specific group or "clique" of Agents that he preferred; he showed them clear and marked favoritism in terms of assignments, compensation, schedules, and training. Those Agents were all white.

228.    In 2018, Plaintiff Burton had the opportunity to review BWC footage of an arrest made by Officer James Craig of a young Black male, in which Officer Craig grabbed the man by the throat, held him that way, and then placed him in handcuffs.  Plaintiff Burton observed that the young man had been unmoving during the entire altercation, did not aggress or move on Officer Craig, did not resist arrest, and was not engaged in any activity that would warrant arrest.

229.    Plaintiff Burton was aware that Officer Craig took the young Black man into custody and falsely charged him with resisting arrest.

230.    Plaintiff Burton states herein that a false statement of this nature is a serious offense that is almost always referred to a Disciplinary Review Board if substantiated.  Despite the fact that serious allegations against Officer Craig were substantiated by the investigating Agent, Plaintiff Burton is aware that Officer Craig did not go to a DRB.  Upon information and belief, the only persons with the authority to cancel a DRB are Chief Manlapaz and the Chief of Police.

231.    Upon his arrival at IAD, Chief Manlapaz stated that he did not like the staffing of IAD, and that he planned to "make changes."  At the time, IAD had nine (9) Black female Agents, including Plaintiff Burton.

232.    Plaintiff Burton was one of the Black women Agents that Chief Manlapaz took steps and efforts to move out of IAD.

233.    In August of 2019, Plaintiff Burton reported a fellow IAD Agent to EEO for making a racist and disparaging comment about Black men.  She sent an email to Mr. Lee at EEO.  Instead

of investigating the claim, Mr. Lee violated Plaintiff Burton's confidentiality by speaking to her immediate supervisor, Cpt. Bray, about it, and informing the Agent who was reported that Agent Burton had reported his racist comment.

234.   Immediately thereafter, Plaintiff Burton became the subject of retaliation from her fellow Agents, and the Agent who made the comment, in particular.

235.   Plaintiff Burton attempted to meet with Chief Manlapaz for six (6) months, without success, to speak to him about the bullying, harassment, negative comments, and hostile work environment that she was enduring because she reported her colleague.

236.   Plaintiff Burton had her duties stripped from her, had her vehicle taken away, was denied training opportunities and was ostracized while she was on investigations because of her EEO report.

237.   On or about October 11, 2019, a white female Agent, Rachel Pulliam (hereinafter "Agent Pulliam") bullied Plaintiff Burton in the workplace by getting into a confrontation with her, attacking Plaintiff Burton because of her age, and yelling at her in a loud and humiliating way.

238.   Agent Pulliam is married to a Captain in MPD who works directly for the Chief of Police.

239.   The incident was witnessed by two IAD Agents, and one wrote a five-page statement establishing that the white female agent was the instigator of the incident, and that her behavior was inappropriate.

240.   Nevertheless, no action was taken against Agent Pulliam and instead, the bullying and retaliation against Plaintiff Burton escalated.

241.   On or about October 13, 2019, Plaintiff Burton reached out to the Chief of Police at the time (hereinafter "Chief Newsham"), because she was overwhelmed and at her breaking point with respect to the constant negative treatment and double standard she was subjected to.

242.     Plaintiff Burton's email to Chief Newsham prompted her first actual meeting with Chief Manlapaz, which took place on or about October 30, 2019.

243.     Plaintiff Burton complained to Chief Manlapaz about the way the Black female agents were being treated, and being systematically targeted for removal by being transferred, terminated and/or overloaded with work such that they would resign.

244.     Plaintiff Burton specifically raised with Chief Manlapaz that Black women Agents were being held to a different, harsher standard, than their white counterparts, and they were being hyper-scrutinized and micromanaged in way that white Agents were not.

245.     On or about November 7, 2019, Plaintiff Burton was ordered to attend a mediation to discuss her concerns.  She was not given time to obtain counsel, and was not given the chance to opt out.

246.     This contrasted sharply with the way the white male colleague whom she had reported for racist comments was treated.  He was allowed to opt out of mediation.

247.     Despite her request that the incident with Agent Pulliam be further investigated, the two officials at the mediation chose to destroy all records of the incident because they did not want to interfere with Agent Pulliam's imminent promotion, and an active investigation would have held it up.

248.     It is against MPD policy for written statements alleging or relating to inappropriate and discriminatory behavior, to be destroyed for any reason.

249.     Plaintiff Burton filed her first EEOC charge in December of 2019.  Mr. Lee from MPD EEO provided a false and misleading response to the EEOC about the incident, and failed to provide the statements that corroborated Plaintiff Burton's account of the incident with Agent Pulliam.  The EEOC thus dismissed the charge.

250.    In March of 2020, Plaintiff Burton met with Doreen Haines of EEO to complain about the continued bullying, harassment and retaliation she was being subjected to by the Agents who were allies of Agent Pulliam.  However, no investigation was initiated, and EEO took no steps to address what was happening to Plaintiff Burton.

251.    In the Spring of 2020, Plaintiff Burton was denied the right to telework due to the COVID pandemic, even though she had underlying health conditions, and permission was granted to a white male sworn officer who, technically, was not supposed to able to telework.

252.    Plaintiff asserts that she was treated differently because of her race and gender, and was retaliated against for reporting hostile and discriminatory behavior.

253.    Agent Pulliam was promoted, despite the allegation against her, and the entire incident was buried by Chief Manlapaz and his subordinates. The Agent who made the racist comment about Black men was permitted to retire, and then come back to IAD as an SPO officer.  He was later promoted into a specialized unit.

254.    On or about June 12, 2020, Plaintiff's supervisor Lieutenant Darren Haskis (hereinafter "Lt. Haskis") attempted to place her on a Performance Improvement Plan, without any justification or basis.  However, Plaintiff Burton was always rated as a successful Agent.

255.    Plaintiff Burton successfully challenged the unfair and inaccurate attack on her performance, but the attempt to defame and undermine her, caused Plaintiff Burton severe stress and anxiety, and took a toll on her health.

256.    Plaintiff Burton was forced to use short-term disability to take a break from the stress of her workplace, and to seek help with her stress management.  When she returned to work, she was bombarded with work, given thirteen (13) cases within ten (10) days of returning to work, which was a clear effort to overwhelm her and add to her stress and anxiety.

257.    In the months that followed, Plaintiff Burton was singled out for scrutiny from her supervisors, given deadlines that applied to her and no one else, denied training opportunities, and given cases that were assigned to male IAD Agents, but in which she was told to complete the work, without explanation or assistance.

258.    When Plaintiff Burton asked for help with her workload and clarification about the scope of the work she was told to do on cases that were assigned to other agents, she was written-up for "insubordination."

259.    In October of 2020, Plaintiff Burton asked for and was approved to use FMLA leave. While she was out on approved leave, her Lieutenant, Craig Solgat (hereinafter "Lt. Solgat"), constantly emailed and called her.

260.    Lt. Solgat's harassment of Plaintiff Burton was so incessant that she came into work to confront him about it.  Lt. Solgat was new to the division, and had never actually met Plaintiff Burton in person.

261.    Plaintiff asserts that the reason Lt. Solgat gave for harassing her and insisting that she respond to him and do work while on FMLA leave was petty, and was pretext for trying to bully and harass Plaintiff Burton as part of Chief Manlapaz's scheme to push her out of IAD.

262.    On or about April 6, 2021, Plaintiff Burton met one more time with Chief Manlapaz to discuss with him the racially hostile and sexist work environment she was being subjected to.  She showed Chief Manlapaz a T-Shirt that was being passed around the office by white male Agents, that had a racist and offensive political message on the front of it.

263.    MPD policy strictly prohibits the wearing or displaying of political messaging at work, so there was no reason or excuse for the T-shirt to be brought in at all.

264.     However, the T-shirt was brought in by one of Chief Manlapaz's favored white male Agents, so again, he took no action against the white male officer.

265.     To the contrary, the officer in question filed an EEO complaint against Plaintiff Burton for complaining to Chief Manlapaz, and the Chief had one of his subordinates initiate an investigation into Plaintiff Burton for "theft" because she took the T-shirt to show it to Chief Manlapaz and unfolded it to take a picture of it.  Plaintiff Burton immediately put the T-shirt back in place once she had done so.

266.     Then Chief Manlapaz opened another investigation into Plaintiff Burton, accusing her of insubordination for writing an email that accused a fellow Agent of discrimination.

267.     Plaintiff was ultimately pushed out of IAD and given no alternative but to accept a transfer to retain her employment.

268.     On or about May 24, 2021, the day that Plaintiff Burton was leaving IAD, instead of being treated as a valuable team member who was simply transferring to a different department, Plaintiff Burton was forced to box-up her things under the scrutiny of Lieutenant Deborah Pearce, and  was bullied and essentially treated like a criminal, or an employee who had been fired for misconduct.

269.     Plaintiff Burton was escorted everywhere she went in IAD, and humiliated in front of her colleagues.  The incident was so out of the norm for the department, that Plaintiff Burton wrote an email to her superiors about it.

270.     Plaintiff Burton also sent that email to Executive Assistant Chief Ashan Benedict (hereinafter "Mr. Benedict"), to inform him of what had happed to her.  On or about June 2, 2021, Plaintiff Burton met with Mr. Benedict to discuss her dismay with the hostile work environment in IAD, and the pattern of retaliation that took place there.

271.    Plaintiff Burton later filed a new EEOC charge related to the cumulative hostile environment and retaliatory and disparaging way she was treated in transitioning out of IAD.


## PLAINTIFF BURTON'S CLAIMS

(Race Discrimination Based on Hostile Work Environment and Retaliation)

### COUNT XIII
### Violation of Title VII

272.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

273.    Over the course of her tenure in IAD, Plaintiff Burton observed, and asserts herein, that Black officers at MPD are subjected to more frequent and more harsh discipline than their white counterparts for the same offenses.

274.    Plaintiff Burton asserts, on information and belief, that Black officers are subject to harsher discipline to a statistically significant degree, and that robust discovery on this issue will prove it.

275.    Plaintiff Burton asserts that this disparity substantially increased during the tenure of Chief Manlapaz, and furthermore, that Chief Manlapaz was far more active in inserting himself into Agent investigations than his predecessor.

276.    Plaintiff Burton asserts that Chief Manlapaz uses his power and office to protect and help white police officers he favors who get into trouble for misconduct, by inserting himself into the disciplinary process to mitigate or bypass discipline for them.

277.    Plaintiff Burton asserts that Chief Manlapaz, by way of his subordinates, inserted himself into an incident between herself and Agent Pulliam, who is a white female, in which Agent Pulliam aggressed on Plaintiff Burton, denigrated her based on her age, and acted in a hostile and unprofessional way.  Chief Manlapaz, by way of his subordinates, stepped in to protect Agent

Pulliam from discipline and to prevent an investigation into Agent Pulliam's actions to salvage her promotion.

278.    Plaintiff Burton asserts that Chief Manlapaz, and/or his agents, destroyed records related to the incident in order to protect Agent Pulliam, and that such was a blatant violation of MPD policy.

279.    Plaintiff Burton asserts that in addition to his favoritism towards white officers, Chief Manlapaz harbors racial animus against Black women, and acted on his animus by actively and systematically removing Black women IAD Agents from the department.

280.    Plaintiff Burton asserts that she was systematically targeted for harassment, unfair treatment, disparate treatment, bullied, and inaccurately evaluated because of her race, and in furtherance of Chief Manlapaz's scheme to remove Black women Agents from IAD.

281.    Plaintiff Burton asserts that Lt. Haskis attempted to put her on a Performance Improvement Plan for false and inaccurate reasons, and that although she successfully appealed, the incident caused her severe stress and mental anguish.

282.    Plaintiff Burton asserts that this effort to attack her credibility, disparage her work and put her employment in jeopardy was motivated by racial animus because she is Black.

283.    Plaintiff Burton asserts that she was prohibited to work from home during the COVID pandemic as a form of racial harassment, and without a legitimate business case or reason, when a white male Agent who was required to work on-site due to his status, was allowed to work from home.

284.    Plaintiff Burton asserts that Chief Manlapaz exercised his discretion to deny her the benefit to work in a safer environment during COVID for the express purpose of putting her health at risk,

and to ensure she remained present in a work environment that was caustic and stressful, in furtherance of a scheme to pressure Plaintiff Burton to voluntarily leave IAD.

285.   Plaintiff Burton asserts that her superiors singled her out for undesirable assignments, overburdened her with work, and denied her training and development opportunities because of her race.

286.   Plaintiff Burton asserts that Cpt. Bray, Lt. Haskis and Chief Manlapaz fostered and encouraged a workplace that was rife with racist, racially insensitive, and off-color comments and jokes, that in the aggregate created a hostile work environment for Black women Agents due to their race.

287.   When Plaintiff Burton attempted to speak to her superiors about the racially hostile work environment she was enduring, and her concerns about racial disparities in the frequency and severity of discipline of Black MPD officers as compared to white officers, she was rebuffed, ignored, dismissed and retaliated against.

288.   Plaintiff Burton asserts that once she filed an EEO complaint about the hostile work environment she was enduring, she became the target of a coordinated effort to push her out of IAD, and that this scheme was orchestrated and directed by Chief Manlapaz.

289.   Plaintiff Burton asserts that Chief Manlapaz exerted his influence and management control over EEO Director Alphonso Lee to ensure that Plaintiff Burton's allegations were not taken seriously or properly investigated.

290.   Plaintiff Burton was falsely accused of theft and insubordination as part of a scheme and plan to force her to voluntarily move out of IAD.

291.    On or about May 24, 2021, as a direct attack on her character, and in furtherance of a scheme to denigrate and shame her, Plaintiff Burton was humiliated and bullied as she was packing her things in preparation for a move to a different department.

292.    As a long-tenured IAD Agent, Plaintiff Burton had observed how other Agents were treated when they were leaving IAD.  None were treated as she had been by her superiors.

293.    Plaintiff Burton was so disturbed and offended by how she was treated on her exit, she immediately complained about it, making clear that the actions of her department were disparaging of her character, as they framed her as being removed for disciplinary reasons.

294.    Although Plaintiff Burton had the opportunity to speak with Mr. Benedict about the hostile work environment in IAD, and about the humiliating and disparaging way she was bullied and treated in front of her colleagues, none of her complaints were taken seriously.

295.    Plaintiff Burton asserts that the events of May 24, 2021, are part and parcel of a racially hostile work environment, and were blatant acts designed to disparage and publicly humiliate her.

296.    Plaintiff Burton asserts that the cumulative effect of the harassment, hostile work environment and retaliation she endured in IAD caused her severe mental stress and anxiety and emotional suffering, and caused damage to her reputation.

297.    Plaintiff Burton asserts that she was unfairly targeted for harassment for the express purpose of moving her out of IAD because Chief Manlapaz harbors animus towards Black women Agents.

298.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

## COUNT XIV
## Violation of the DCHRA

299.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

300.    Plaintiff Burton reasserts all legal and factual predicates for her race discrimination claim under Title VII as if fully restated herein.

301.    Plaintiff Burton asserts that she was the victim and target of a scheme to move her out of IAD based on her race, in violation of the DCHRA, and as a direct and proximate cause of the hostile work environment and retaliation she endured, she has suffered severe mental anguish and emotional stress.

302.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

## COUNT XV
## Violation of 42 U.S.C. Section 1981, Enforced by Section 1983

303.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

304.    Plaintiff Burton reasserts all legal and factual predicates for her race discrimination claim under Title VII as if fully restated herein.

305.    Plaintiff Burton further asserts that Chief Manlapaz's open hostility to Black female Agents encumbered her ability to maintain and enjoy fair employment, and unlawfully forced her out of IAD.

306.    Plaintiff asserts that the hostile work environment and retaliation she endured in IAD were endemic of race discrimination in violation of 42 U.S.C. § 1981, and as a direct and proximate

cause of such discrimination, she has suffered damage to her reputation, and severe mental anguish and emotional stress.

307.    Plaintiff seeks to enforce her rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983.

308.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

(GENDER DISCRIMINATION)

## COUNT XVI
## Violation of Title VII

309.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

310.    Plaintiff Burton asserts that Chief Manlapaz harbors a peculiar and particular animus towards Black women at MPD, and that he made his dislike of Black women known as soon as he took over IAD.

311.    On information and belief, at least eight (8) different Black women at MPD have filed internal and/or external complaints against Chief Manlapaz since 2017.

312.    Plaintiff Burton asserts that EEO Director Alphonso Lee also harbors animus towards Black women at MPD, and that Chief Manlapaz and Mr. Lee work together to attack, harm, discredit and remove Black women from MPD.

313.    Plaintiff Burton asserts that in addition to his favoritism towards white officers, Chief Manlapaz harbors gender animus against Black women, above and beyond, and of a different nature to his animus against Black men, and acted on his animus by actively and systematically

removing Black women IAD Agents from the department, while keeping the level of Black men in IAD constant.

314.    Plaintiff Burton asserts that she was targeted, harassed, falsely accused, unfairly evaluated and retaliated against as part of Chief Manlapaz's scheme to remove Black women Agents from IAD.

315.    Plaintiff Burton asserts that her vast amount of experience, the strength of her performance in IAD, her tenure in IAD, as well as the staffing shortage in IAD, makes the decision to push her out illogical, and is proof that it was the result of unlawful gender animus.

316.    Plaintiff Burton asserts that the scheme to subject her to a hostile work environment, to retaliate against her and to publicly humiliate her were acts of gender discrimination in violation of Title VII, and as a direct and proximate cause of such discrimination, she has suffered mental anguish and emotional stress, and damage to her reputation.

317.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

**COUNT XVII**
**Violation of the DCHRA**

318.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

319.    Plaintiff Burton reasserts all legal and factual predicates for her gender discrimination claim under Title VII as if fully restated herein.

320.    Plaintiff Burton asserts that the scheme to move her out of IAD was an unvarnished act of gender discrimination in violation of the DCHRA, and as a direct and proximate cause of the

discrimination she was subjected to, she suffered severe mental anguish and emotional stress, and damage to her character and reputation.

321.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

(AGE DISCRIMINATION)

## COUNT XVIII
## Violation of the ADEA

322.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

323.    Plaintiff Burton asserts that Chief Manlapaz harbors a peculiar and particular animus towards older workers, and that he has made his dislike of older workers known as soon as he took over IAD.

324.    On information and belief, the median age of Agents in IAD has dropped from 2018, when Chief Manlapaz took over by approximately fifteen (15).

325.    Plaintiff Burton asserts that EEO Director Lee also shares this animus towards older workers at MPD, and that Chief Manlapaz and Mr. Lee work together to attack, harm, discredit and remove older workers from IAD.

326.    Plaintiff Burton asserts that she was targeted for removal from IAD in part because of her age, and in furtherance of Chief Manlapaz's scheme to remove older Agents from IAD.

327.    Plaintiff Burton asserts that when Agent Pulliam attacked her and denigrated her based on age, her complaints about it were ignored and dismissed, and the records related to the incident were destroyed, in contravention of MPD policy.

328.  Plaintiff Burton asserts that she was singled out to be placed on an unwarranted Performance Improvement Plan as part of a scheme to move her out of IAD, in part because of her age.

329.  Plaintiff Burton asserts that there was no legitimate business reason to move her out of IAD because it was understaffed at the time, and that the coordinated scheme to do so was motivated in part by her age.

330.  Plaintiff Burton asserts that Chief Manlapaz moved her out of IAD because she was an experienced and confident Agent who could challenge and oppose his actions.

331.  Plaintiff Burton asserts that the way she was treated constitutes age discrimination in violation of the ADEA, and as a direct and proximate cause of the discrimination, hostile work environment and retaliation she endured, she suffered severe mental anguish and emotional stress, and damage to her character and reputation.

332.  Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

## COUNT XIX
## Violation of the DCHRA

333.  Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

334.  Plaintiff Burton reasserts all legal and factual predicates for her age discrimination claim under the ADEA as if fully restated herein.

335.  Plaintiff Burton asserts that the way she was treated constitutes age discrimination in violation of the DCHRA, and as a direct and proximate cause of the discrimination, hostile work

environment and retaliation she endured, she suffered severe mental anguish and emotional stress, and damage to her character and reputation.

336.     Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation of not less than $350,000, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

(FAMILY AND MEDICAL LEAVE CLAIM)

## COUNT XX
## Violation of FMLA

337.     Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

338.     Plaintiff was authorized to take and use FMLA leave.

339.     While on FMLA leave, Plaintiff Burton was incessantly harassed by her Lieutenant about a minor issue, thus interfering with her ability to use FMLA.

340.     Lt. Solgat's emails and phone calls to Plaintiff were so frequent and burdensome that she went in to work, while on leave, for the express purpose of confronting him about interfering with statutory rights.

341.     Plaintiff Burton complained about Lt. Solgat's behavior to her superiors, and it eventually stopped.

342.     The reason Lt. Solgat gave for harassing Plaintiff Burton while she was on FMLA-protected leave was petty, and did not justify his actions.   Plaintiff herein asserts that Lt. Solgat's reasons were pretext for harassing and retaliating against her for taking FMLA leave, and were part of Chief Manlapaz's scheme to push Plaintiff Burton out of IAD.

343.     As a direct and proximate cause of Lt. Solgat's harassment, Plaintiff Burton suffered mental stress and emotional distress, and was hampered in the exercise of statutory rights.

344.     Plaintiff now asks this Court for compensatory damages for Defendant's violation of the FMLA by way of interference and retaliation, as deemed appropriate by this Court to make her whole.

(WHISTLEBLOWER CLAIM)

**COUNT XXI**
**Violation of DCWPA**

345.     Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

346.     Plaintiff Burton engaged in protected activity when she reported race and gender discrimination, hostile work environment, favoritism towards white officers, and the fact that IAD had destroyed files related to her claim against Agent Pulliam to her superiors, and filed EEOC charges related to the same.

347.     Plaintiff Burton was targeted for retaliation by Chief Manlapaz and his subordinates because she engaged in protected activity.

348.     The retaliation Plaintiff Burton endured is outlined in the previous paragraphs and is fully incorporated herein.

349.     Plaintiff Burton also had knowledge about the allegations against Officer James Craig for making false statements, and falsely imprisoning a young Black man, and possibly violating his civil rights.

350.     Plaintiff Burton asserts that she was targeted for discrimination and retaliation in part because she was speaking out about the favoritism and improper actions of Chief Manlapaz, who was inserting himself into cases to protect white officers.

351.     Plaintiff Burton asserts that the substantiated charge of making false statements against Officer Craig, was the type of charge that was never deferred to lesser punishment, and was always

heard by a Disciplinary Review Board, and that but-for Chief Manlapaz's intercession, Officer Craig would have gone to a DRB.

352.    Plaintiff asserts that Chief Manlapaz inserted himself into the disciplinary process to protect Officer Craig, and that the Chief of Police approved of Chief Manlapaz's actions.

353.    Plaintiff Burton asserts that she was moved out of IAD to silence her, and to remove her from participating in investigations of white officers.

354.    Plaintiff Burton asserts that Chief Manlapaz's scheme to remove her from IAD was an unvarnished violation of the DCWPA, and as a direct and proximate cause of it, she has suffered severe mental anguish and emotional stress, and substantial damage to her character and reputation.

355.    Plaintiff Burton now seeks compensatory damages, as well as damages for her emotional and mental anguish, and damage to her reputation, and all other remedies, including the right to reinstatement to IAD, as the Court deems appropriate to make her whole.

(COMMON LAW CLAIM)

**COUNT XXII**
**Negligent Supervision**

356.    Plaintiff Burton references and fully incorporates the allegations in the previous paragraphs as if fully restated herein.

357.    On information and belief, no less than eight (8) complaints against Chief Manlapaz have been filed by Black women police officers since 2017.

358.    Black women officers have complained about Chief Manlapaz for being both racist and sexist, and for favoritism to white male officers both internally, and to the DC Office of Human Rights, the EEOC, the Mayor's Office and the DC City Council.

359.    Specific and detailed allegations against Chief Manlapaz have been filed by officers from every department, at a volume that placed Defendant on clear notice that there was a problem with him.

360.    On information and belief, several complaints against Chief Manlapaz have been filed with the District of Columbia Office of the Inspector General.  To date, the OIG has taken no action on any of these claims.

361.    On information and belief, several members of the MPD chain of command have raised concerns about Chief Manlapaz inserting himself into IAD investigations to protect and shield white officers from security and discipline.  None of these concerns have been taken seriously or addressed.

362.    The Chief of Police and Mayor Bowser owe a duty of care to all MPD officers and employees to ensure that they can maintain their employment free from discrimination or retaliation contrary to public policy.

363.    The Chief of Police and Mayor Bowser owed a particular duty of care to Agents within IAD to protect them from retaliation for doing the difficult and thankless job of policing the police, and maintaining the public trust.

364.    The Chief of Police and Mayor Bowser violated their duty to Plaintiff Burton by willfully ignoring the voluminous and diverse complaints against Chief Manlapaz, and allowing him to remain in his position.

365.    Plaintiff Burton has been directly harmed by the actions of Chief Manlapaz in targeting her for removal, in violation of both federal and DC law, and thus has been directly harmed by the negligence of the Chief of Police and Mayor Bowser, in not carefully and properly supervising Chief Manlapaz.

366.    The harm that Plaintiff Burton has suffered as a result of Chief Manlapaz's action was easily foreseeable because the Chief of Police and Mayor Bowser were placed on notice of the risk that Chief Manlapaz posed to the MPD and to the officers and Agents under his control.

367.    The harm that Plaintiff Burton suffered was of the kind and nature that was predictable, and closely related to the other claims made against Chief Manlapaz in the past.

368.    As a direct and proximate cause of the negligence of the Chief of Police and Mayor Bower in supervising Chief Manlapaz, Plaintiff has suffered severe mental and emotional stress, and substantial damage to her character and reputation.  She now seeks compensation in an amount deemed appropriate by the Court, as well as reinstatement to her previous position, and all other remedies the Court deems appropriate to make her whole.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Donald M. Temple*
Donald M. Temple
Pamela M. Keith
Temple Law Offices
1310 L St. NW
Suite 750
Washington, DC 20005
Dtemplelaw@gmail.com
pamkeithtemplelaw@gmail.com
202-628-1101 (o)
202-302-0383 (m)
*Attorneys for Plaintiffs*